320-0015 Joanne Grettenford-Zobar, a special administrator of the estate of Stephen A. Zobar, deceased, appellant, versus Joseph Kokoszka, MD, and Illinois Valley Surgical Associates, Appalese. Thank you. Good afternoon. Good afternoon. Ms. Dowd, anytime you're ready, you can start. Very good. Good afternoon, Your Honors. For the record, my name is Lynn Dowd, and I represent the plaintiff appellant in this case. And today we are bringing forward for the court's review what we submit as a very straightforward appeal with essentially three issues. We submit that the trial court's failure to instruct the one, the IPI 1205 that deals with instructing the jury that a contention that another cause, such as a pre-existing condition that may have contributed to the death of the decedent in this case, is not a defense, that that alone is reversible error. We also submit that the non-IPI instruction we tendered on lost chance or loss of a better outcome in this particular case the failure to get that instruction is reversible error alone, and then also the failure to give an IPI instruction 31.13 dealing with the life tables. There is some case law saying that that failure can be reversible error, but certainly it's our position that if there is a retrial in this case, it is critical that we be allowed to present those life tables to a jury. So I'll go into each one of these instructions and I will try to hone my arguments as much as possible. I won't reiterate what we've said in our briefs, but to put these instructions in context, I'd like to start with the articulation by defense counsel during his closing argument where he said, quote, and this is on page 977 of the record, the only dispute in this case really is whether there ever was an indication of an abdominal process that could be treated surgically. We agree. We agree that that was the only issue presented for the jury's review. That's the negligence issue for which we brought forth quite substantial evidence from numerous experts and treating physicians. And of course the defense countered with their own experts and of course examined the various witnesses. But with that, keeping that that's the issue in mind, the applicable legal standards to decide whether or not we are entitled to a new trial are that the jury must be correctly instructed on the law. That is so fundamental in our system. And also that the plaintiff is entitled to have the jury instructed on all issues that have been reasonably presented by the evidence. I know it's our burden to explain also why the other instructions given in this case didn't cure these errors and I will do that throughout my presentation. But it's our position that the failure to give at least two of these three instructions, the first two was an abuse of discretion and under quite a bit of case law constitutes reversible error because it deprived the plaintiff of her right to have the jury instructed on her theory of this case. Namely that the defendant deviated from the standard of care by not performing the surgery for the small bowel instruction and failing to not do it in a timely fashion. The more precise instructions are laid forth are laid out in the issues instruction. Um, and just as a footnote regarding the standard of review, because this is a point the defense made in their brief, the recent Bailey decision that we've cited as additional authority towards the end of the decision. And that one deals with the lost chance instruction first and foremost. But at the end, the Bailey court points out that when the jury, the correctness of the jury instructions are at issue, the manifest way to the evidence standard is inapplicable. You never get to that. And it makes sense. Logically, you can't talk about the weight of the evidence if the jury wasn't instructed correctly on how do we evaluate the evidence? All right. With respect to the first instruction at issue IPI 1205, um, I would like to bring to the court's attention, and this is citing the record at page 294. The reason that the trial court denied this instruction, the court misunderstood respectfully, uh, the evidence that was presented because the court said, and I'm quoting or excuse me, the court said the plaintiff could not present this instruction because quote, she could not recover for conditions which are due entirely to a previous disease. That's an incorrect statement of the law and of the evidence presented in this case. The Holton decision at pages 1 15 and 1 16 talks about the applicability of negligence in the context of an underlying preexisting condition, a spinal degenerative disease. And the Holton court instructs that 1501 alone does not correctly instruct the jury on proximate cause. 1205 is the only instruction that tells the jury they have the right to reject a defense that a preexisting condition was the cause of the death. And this is important because preexisting conditions come up in medical malpractice and negligence collision cases all the time, but they come up for a variety or they can come up for a variety of reasons. For example, the evidence about the existence of a preexisting condition might come up to explain that it's not relevant or that the defendant is still responsible for aggravating a preexisting condition. However, the case law that we've cited, including Supreme Court case law, states that once the defendant places an issue, the defense that the patient's preexisting conditions were the cause of death or the cause of the injuries, that triggers 1205. 1205 is the only instruction that tells the jury it has the right to reject that defense, that it's not a defense. Without that, the jury is left just to evaluate the various causes and they don't understand that the law of Illinois enables them to reject that. And this is critical because that is the only way the jury can fairly and fully and distinctly, as the Bailey Court says, evaluate the evidence. Let me ask you a question about that. Doesn't 1501 say it need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury. Doesn't that say the same thing that 1205 says? No, it does not, Your Honor. All that 1501, and first of all, in this case, the defense did not ask for the long form of 1501. But all that 1501 does, and this is explained in Eleg, Dolan, and the other cases we cited, is it educates the jury on Illinois law that there negligence alleged was a proximate cause of the injury. It doesn't connect the jury with the next step that enables it under Illinois law to evaluate this defense of the preexisting condition. And it gives them the right that they can reject it. Nothing in 1501 tells a jury it can reject that defense. Only 1205 does. Well, back to Justice Schmidt's question. Doesn't that really imply, as well as 1205, that it's not sufficient to have a defense that there's a contributing cause or underlying preexisting condition? Not necessarily, Your Honor. And I refer the court to the Eleg decision, which says 1205 must be given to the jury in order to correct any negative implications arising from the other instructions. The decisions, we can't presume that the jury is going to make that connection. What's the implication of the other instruction that was given? Well, there could be an implication that because there's other causes, it's left to just pick one. It doesn't educate the jury that there can be evidence of multiple causes of the injury, in this case, the death. But again, honing in on whether the defendant committed negligence, nothing in 1501 tells them they can reject this defense of a preexisting condition. The jury, you know, the decisions say we can't just assume that's what the jury will do. Stated another way, why would we have 1205? Why is 1205 there? Under the question I'm asked, 1501 would be all we'd ever need. 1205 was written for a reason. It's come about in the law precisely for cases like this. Well, doesn't 1501 allow you to make the argument you're making to us, you make that argument to the jury? Look, the instruction will explain to you that some other cause is not a defense. Yes, it allows for the argument, Your Honor, but actually in the various cases, and I do believe it was even Holton. The problem with that is that the jury's left with argument of counsel and argument of counsel is not evidence. It is not a statement of the law. 1205 is a statement of the law. And I could go through the various cases, but, you know, the bottom line is, this is the only instruction. This case, the facts of our case cried out for 1205. This is our theory. And the bottom line is that if we presented evidence that, you know, the evidence we presented, we were entitled to have an instruction on that. And we were entitled to have the jury focus as the defense counsel said on the only issue being whether the defendant doctor failed to perform the small bowel obstruction procedure in a timely fashion. That's the essential issue. The essential issue is not whether he died of comorbidities or preexisting conditions. Okay. And then just also just to follow up the other instructions, the defendant cited 20.01. That's the plaintiff's issue instruction that has nothing to do with educating them on the proper proximate cause law of Illinois. 21.01 was a burden of proof instruction, has nothing to do with proximate cause. 30.21 was a damages instruction, has nothing to do with proximate cause. Now, also proximate cause obviously is a key element in every professional negligence case. But here, you not only have the lack of 1205, which I submit alone is a basis for reversal, but we also were denied our non-IPI lost chance loss of a better outcome instruction. Now, importantly, as I know the court's aware, Holton is really the focal point or the beginning point on analyzing this particular issue. And the court in Holton went out of its way to say, because of the uniqueness of the facts in every particular case, we will not have an IPI instruction for lost chance or better outcome. These instructions must be tailored to the facts of the particular case. And Holton directs that if we, if the plaintiff presents evidence on this theory of the case, and if we present some evidence, we are entitled to have the instruction. Now, again, if I could put this in context, the trial court never ruled that the form of our proposed instruction was flawed or bad. And I think that's important because what the trial court said, and the reason the trial court rejected this instruction is because the trial court believed these diseased organs were an exclusive cause of the death. Well, most respectfully, that's for the jury to decide. We were entitled to have the instruction, evidence was presented. And again, this brings everything full circle. The jury had to be correctly instructed on the law. Now in Holton, again, that's the beginning point. It distinguished or it articulated that this type of instruction should be given under two different circumstances. One, if the plaintiff or the plaintiff's decedent was deprived of a chance to survive, and that's the evidence we presented here. And if it lessened to the effectiveness of the treatment, which is different from an increased risk of harm and a traditional proximate cause instruction. So the evidence we presented in this case was twofold. With respect to Mr. Zobar, the evidence from our experts and various treaters showed that when he presented at Morris Hospital, he came in on the 14th. And by the time, on February 14th, excuse me, he was there on the 15th and then the 16th, and his condition was stabilized on the 16th. By the 17th, there's expert testimony saying that on a cardiac level, he was doing well, he was stabilized, and the x-rays suggested an obstruction. Dr. Kokoska disagreed and ordered a second x-ray. So that brings us to the next day, the 18th. The radiologist said the second x-ray showed small bowel obstruction. Dr. Kokoska disagreed again. But importantly, on the 17th and 18th, the various testimony presented by the physicians was that he was doing well, and that he would have survived surgery. By the afternoon of the 18th, by about 4 p.m., the hardening of his organs was commencing. And by the 19th, his condition was stable. But even through the 19th, the expert testimony stated and was presented to the jury that he would have survived the surgery. So the evidence we presented was twofold, that on the 17th and 18th, the defendant could have stepped in and performed small bowel obstruction surgery, and Mr. Zobar was in much better health, and he would have had a outcome, a better chance of survival on those two days. But also, even through the 19th, when his conditioning was worsening, he could have survived. And the case law says that survival is the better outcome. And we do not have to prove that he would have actually survived, or that he would have been cured, or as the jury asked, that he would have been fixed. We just had to present this evidence. And then, similarly, we were entitled to have the jury instructed that Illinois law permits them to find that the defendant's negligence removed this chance of survival and chance of a better outcome for the patient. And Justice Schmidt, like your argument of counsel, is insufficient. The jury is instructed to be entitled on this law. Now, the Bailey case that came out could not be more helpful, I think, to addressing this particular issue, because there's a case that turned on the presentation of three... There's a red light on this now. Pardon me? There's been a red light on for a while. Your time is up. Oh, my time is up. I'd be happy to finish if the court would like, or... You'll have five minutes. Thank you very much. Thank you very much. Ms. Kallross? That is correct. And may it please the court. Your Honors, first, I would like to just address a couple of quick factual matters, and then I will delve into the legal argument. There were some serious allegations made in the reply brief of false statements and misrepresentations by defense counsel in this case that I feel must be responded to. The defendants did not misrepresent the record. Dr. Jones and Dr. Ratnicki both testified that there was no indication for surgery. Dr. Jones was asked, doctor, in your care and treatment of Mr. Zobar during this admission, in your opinion, as a family practitioner, was there ever an indication for abdominal surgery? Answer, no. That is at sub three, C39, page 71, lines five through nine. Dr. Ratnicki, the gastroenterologist, was asked, in your treatment of, and your staff's treatment of Mr. Zobar on the 15th, 16th, 17th, 18th, and 19th, on each of those days, was there ever an indication that Mr. Zobar was suffering from an acute or surgical abdomen? Answer, no. That is at sub three, C18, page 57, lines one through six. The reply brief accuses the defendants of making misrepresentations regarding those facts. So I wanted to provide those sites to the court so that they can check and verify. The plaintiff has also accused us in the reply brief of making false statements concerning their expert, Dr. Greenberg, that his opinion was contrary to Mr. Zobar's treating physicians as to whether there was ever an indication for abdominal surgery to be performed. And I've just read to you the answers from Dr. Jones, the primary care physician, Dr. Ratnicki, the gastroenterologist, and of course, Dr. Kokoschka, the surgeon, opined in multiple places, testified in multiple locations that there was never a surgical abdomen. I will just refer the court to pages 267 through 268 of the report of proceedings, where Dr. Kokoschka testified, quote, if surgery was necessary, we would discuss it, but there was no indication to do surgery. And I'm sorry to take the time, but I felt that those allegations of rule 341 violations by the defendants needed to be addressed. With that, I will turn to the argument that the plaintiff has set forth that the trial court abused its discretion in refusing the three tender jury instructions that she has discussed in her brief. Regarding short form IPI 1205, that was properly refused. The long form of IPI 1501, and it doesn't matter who asked for the long form, the long form was given, states that a cause in the natural or ordinary course of events produced the plaintiff's injury. It need not be the only cause or the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury. This covers any allegation that pre-existing conditions, the heart failure, the pleural effusion, the liver problems, the kidney problems, those could all be part of the mix. And if the defendant still engaged in negligent conduct, that could be a proximate cause. It did not need to be the proximate cause of the injury. There is no Illinois case law stating that 1205 must be given where 1501 is not. It is not that the Eleg case cited extensively by plaintiffs during this argument and in her brief, the long form of 1501, actually no form of 1501 was given in Eleg. So the discussion in Eleg about what is required with a 1204 or 1205 instruction has no application here. Eleg did not involve a long form or a short form 1501. 1501, we have the Campbell case that we cited in our brief that expressly says where you have a long form 1501 instruction, you do not need a 1205 instruction. You do not need it. The plaintiff attempted to distinguish that case, but it's the same situation. There was a hematoma existing in the injured party that was not caused by the defendants. The plaintiff argued that the defendants nicked the colon and caused injury in addition to the hematoma. And the argument was made that 1205 was necessary and the appellate court rejected that argument and said where the 1501 instruction is used, that is sufficient. There is no case cited in plaintiff's brief under Illinois law that says where you have a 1501, you must also have a 1501. So the reliance on that case is misplaced. Turning to the non-IPI instruction, the lost chance instruction, we have 23 years of precedent following Holton that says no additional non-IPI lost chance instruction is required where the long form of IPI 1501 is given. Nowhere in Holton does it say that you must give a non-IPI lost chance instruction. Plaintiff, I'm not sure where she's quoting from, but nothing in Holton says that. So we look at the cases following Holton, we look at Henry, we look at Lambie, the Sinclair case that the trial court specifically relied upon, the Saterra case that are all cited in our brief, and Saterra states, quote, appellate courts have consistently affirmed refusals of similar proffered non-standard instructions because IPI civil third number 15.01 properly states the law in lost chance medical malpractice cases. So we have 23 years of history post-Holton, no IPI instruction has ever been created for the lost chance doctrine, and we have all of these cases expressly rejecting the argument that plaintiff makes here. It is not necessary for a non-IPI lost chance instruction to be given, and it is certainly not an abuse of discretion or reversible error to reject such a proffered instruction. The Bailey case, which is a relatively new case, one division, one panel of the first district has reached a contrary result. That is the only case that so holds, where they did find that under the facts and circumstances of that case, and the language of the particular non-IPI lost chance instruction used there, that it was reversible error not to give it. But that case, the facts in that case are far different, and the language of the instruction used, the non-IPI instruction that was tendered by the plaintiff is far different. We submit that Bailey is wrong on the law. The Holton court took great pains to lay out that it was not adopting a separate theory of recovery, that there was no separate theory of lost chance. This is merely a concept that enters into the proximate cause analysis. They took great pains to say they were not relaxing the proximate cause standard. They were not creating a new avenue for recovery, and we submit that is why there has been no IPI drafted or approved to address lost chance. That is not an oversight. That is not an accident. That is a deliberate choice to not have such an instruction exist, because it is subsumed within the proximate cause analysis that is discussed in 1501. However, even if this court were to agree with the Bailey legal analysis, the facts, the medical facts here are so vastly different, and the language of the Crawford lost chance instruction is so different that Bailey would not control and mandate a different result. And I do want to draw the court's attention. In Bailey, it was undisputed that if the decedent's bacterial sepsis was timely treated with antibiotics, she would have survived. We don't have a lack of timely treatment in our case. We have a surgeon who evaluated the diagnostic results that were presented to him, found that there was no surgical abdomen, there was not a condition to be fixed by surgery, and the decedent's other problems, his medical condition was so that surgery would not have been his cure, it would have killed him. And there is a plethora of evidence throughout this record that surgery was likely to kill Mr. Zobar, not cure him. Surgery, if the potential small bowel obstruction that was identified on the 17th, if that was an ileus, which is not a mechanical obstruction, it's a paralysis of the bowel, surgery cannot fix that. It's contraindicated for that situation. Even if there was a mechanical small bowel obstruction, in 85% of the cases, if you insert an NG tube, which was done in this case, medical non-surgical management, the small bowel obstruction resolves with that treatment. That is what happened here. As of the morning of the 19th, the small bowel obstruction or ileus, whichever it was, was gone. It was resolved. It did not require surgical intervention. The plaintiff has argued that at least someone testified that Mr. Zobar was doing well on the 18th and would likely have survived surgery. Nobody ever said that. In fact, the plaintiff's trial counsel argued during closing argument, quote, we don't have to prove that he would have survived the surgery. We just have to prove that he would have been offered the surgery and that he did have a surgically addressable problem. Nobody ever testified that Mr. Zobar could have survived this surgery or would have survived this surgery. And that quote is at the record, page 964. Counsel today has said, even on the 19th, he could have been operated on. Well, first, the results of the diagnostics on the 19th showed that the small bowel obstruction or ileus had resolved. So there was no reason to do surgery for that condition at that point. However, even if there was, the family, upon discussing Mr. Zobar's medical condition, declined further medical intervention. No, they didn't want him intubated. They didn't, they put in a do not resuscitate. They had medical treatment removed and he was placed on comfort measures only. That was on 219 in the afternoon. So the argument that surgery should have been performed at that point, I don't know what that would have been addressing because the small bowel obstruction or ileus, whichever it was, was resolved by that point. And the family declined further intervention. So we don't have, we don't have a situation now. I do admit, Dr. Greenberg said that you could still operate on him on 219, but the family declined and there was no reason to operate on him when that condition had resolved with medical management. I do just want to briefly touch on the last issue, which is regarding life expectancy. The trial court did not abuse its discretion in declining the life tables in this case. The undisputed medical evidence was that the plaintiff only had a one to three-year life expectancy because he was suffering from incurable cancer. This was the plaintiff's oncologist who indicated that this with this cancer, Mr. Zobar's life expectancy was one to three years. Plaintiff's counsel in opening statement stated that the life expectancy for Mr. Zobar was one to three years. And in his closing argument, he argued to the jury at page 968 of the record. And I apologize, there's an error in our brief that lists an erroneous record page. The correct site is page 968 of the record at lines 23 through 24. Plaintiff's counsel argued to the jury, quote, we know he was only going to live one to three more years, end quote. So with that undisputed evidence and these arguments and admissions by plaintiff counsel, there is instead to list the life expectancy as one to three years in accordance with the undisputed medical evidence and the admissions opening statement and closing argument that the plaintiff made. And I will just cite the court to the Morris versus Capusta case from the first district that the trial court relied on in making its decisions. And finally, since I have just a instruction, the trial court did find in refusing that instruction that it was vague and confusing. The language talked about delay in treatment, and we don't have a delay in treatment here. The language talked about diminished recovery, diminished outcome. I'm not sure the difference between recovery and outcome, but in the trial court's own words, the tendered instruction was vague and confusing. So even if it otherwise some form of lost chance instruction was appropriate, and we don't submit any form was, but even if some form was appropriate, the trial court's finding that this one was vague and confusing warrants the decision it made in rejecting. There's no reversible error, and we ask that the decision below be affirmed. Thank you. Thank you. Ms. Dowd, any rebuttal? Yes, thank you, and I'll try to be brief. Number one, I'd refer the courts to the Dayhan and the Dolan decisions that we've cited, which says 1501 and 12.05 are both needed. It's not our position that every time 1501 is given, you must have 1205. It's our position under the law that when there's medical negligence alleged, as is the case here, and when the defense injects, the only defense they injected was the patient's pre-existing conditions, 1205 is required, and there's ample law with those identical facts that we've cited in our briefs. Number two, counsel has taken great pains to, quote, disputed evidence to the court. It's not dispositive evidence. Dr. Greenberg testified Mr. Zobar could have survived with the surgery. He testified, his testimony was about his better condition on the 17th and 18th, and let us not forget that a jury is entitled to use their common sense and their own life experiences that the healthier you are at the time of surgery, the better chance you have of surviving the surgery and the better outcome you'll have, and those are in the instructions. They don't have to check their life experiences at the door. Dr. Lertz-Varapa testified he was stable on the 17th and he had a moderate to severe risk with respect to the surgery, but again, the patient was healthier earlier, and even on the 19th, we're not talking up until late in the afternoon where his condition was so bad that the family rejected further interventions. There was testimony even from Dr. Greensberg and others that he could have survived the surgery had that been done earlier on the 19th. Dr. Rotenicke testified that the surgery could have been required if it was a life-threatening condition, which it was for Mr. Zobar. Dr. Zarr on cross-examination conceded the surgery should have been performed to investigate the small bowel obstruction. With respect to the Bailey decision, I'd like to quote, refer the court to paragraph 114. In this case, it's interesting counsel asked the court to reject it because it's so similar to our set of facts. We have a liability case, a medical malpractice case where the defense pertained to an underlying condition of the patient. This was a failure to diagnose and treat bacterial sepsis with antibiotics, and again, the sooner the testimony, the evidence in that case, the sooner they intervened, the better would have been for outcome. And the court, the appellate court says, and it does quite a nice, it's a lengthy opinion, so it does quite an expansive analysis of the lost chance better outcome case law, but it said, and this is approximate cause instruction, 1501, the 1501 instruction does not cure the need for a lost chance better outcome instruction. And the appellate court rejected it because it said, if we didn't have the lost chance better outcome instruction as authorized by Holton, our Supreme Court, 1501 would swallow up the lost chance doctrine and jurors would never be able to learn how the lost chance is to be applied to proximate cause. Only with the instruction, will the theory, excuse me, quote, the theory will be properly before the jury, and it will likely give it more consideration, close quote, proper consideration. The jury in all the cases, excuse me, in the cases we've cited in our brief, the jury is to be instructed correctly on the law, fairly and distinctly, so that it gives proper consideration to the evidence presented. And finally, let me ask you one question about that. Is lost chance, is that really a damages instruction? It's approximate cause instruction. It's that the defendant's negligence took away the chance for a better outcome, and that is one of the causes, a proximate cause of the with respect to the life tables and Dr. Hantel, my very limited time only permits me to highlight Dr. Hantel's, first of all, life tables have been allowed to be admitted since 1895. They are evidence, and it is for, again, the jury to take those life tables and apply their life experience. But even Dr. Hantel's testimony was not dispositive, it was not uncontroverted, and that's by his own words, and I'd like to cite the court to that. Forgive me if I don't have the proper pagination, because I know the video transcript was filed with the court. On page 21, Dr. Hantel said, I told Stephen, I thought it was inevitable that his cancer would reoccur, but no one can be exact about those predictions, talking about himself. Later on, on January 25th, he said Stephen was in remission. There was no evidence of any new disease. He was stable from an oncologic standpoint. July 19th, Dr. Hantel said, I expected the disease would return in a year or two, and I quote, but I couldn't be specific as to when that would happen. And then he went on to testify, Stephen had a more prolonged response than others to treatment. He did better. Predicting life expectancy is not an exact science. Dr. Hantel did not give exact testimony. On October 25th, he said Stephen was doing better. The next time he saw him, January 24th, 2011, the last visit, he said he was fairly stable. Nothing from a cancer standpoint seemed to be any different. There was no progression of his disease. It was controlled reasonably well. And then he talked about the average life expectancy for someone diagnosed with stage four mantle cell lymphoma. But again, he said, when asked about Stephen's life expectancy, quote, it's hard to state with any great detail, because if he became acutely ill as a result of the reactivation, it may be hard to treat. But he was still, had he survived the surgery, A, that's a better outcome. But Stephen was in a stable condition. He was in remission. If and when that cancer came back, he could have undergone treatment. And so we had Dr. Hantel's testimony, but the life tables are admissible evidence and the jury was entitled to get that. And so if we are fortunate enough to get a retrial, that evidence should go to the jury so that it can resolve that ultimate question of fact. Summary judgment was not entered that there were only one to three years of life expectancy. Thank you, your honors very much for your time and attention today. Thank you, Ms. Dowd. We thank both of you for your arguments today. We'll take the matter under advisement and we'll issue a written decision.